IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Marriage of | No. 86265-1-I |
| TRACI A. SAMMETH, | |
| Appellant, | DIVISION ONE |
| and | UNPUBLISHED OPINION |
| JEFFREY R. ERVIN, | |
| Respondent. | |

DÍAZ, J. — Traci Sammeth and Jeffrey Randy Ervin separated approximately 23 years after marrying, and dissolved their marriage through a trial. Sammeth appeals the court's decisions on when the relationship started, the division of the property, and other issues. We affirm its rulings in all respects but remand this matter to the court solely to afford Sammeth the opportunity to be heard on whether she must remove Ervin's name from the mortgage on a home she was awarded.

I.     BACKGROUND

The parties began dating in 1982 and pursued a romantic relationship on and off over the next 16 years, before marrying in 1998. They separated in 2021. Their dissolution trial took place at the end of October and the start of November,

2023.

In December 2023, Sammeth filed a motion for contempt because Ervin had sold community stock, and she argued he disobeyed a prior temporary order by doing so. The court disagreed and did not find him in contempt.

In January 2024, the court entered its findings of fact and conclusions of law and a final divorce order. It found the parties were not in a committed intimate relationship (CIR) prior to their marriage. It awarded 54% of what was their 5.5-million-dollar community estate to Sammeth, while awarding each party their own separate property—approximately $670,000 (43% of the net assets) to Sammeth, and $2.3 million (57% of the net assets) to Ervin. The court also awarded Sammeth spousal maintenance in the amount of $5,000 per month over a total duration of 36 months, which included a period already imposed by temporary order. It awarded Ervin attorney fees based on finding Sammeth intransigent and it denied Sammeth's subsequent motion for reconsideration.

In May 2024, Ervin filed a motion to enforce the divorce decree which requested his name be removed from the mortgage on a home in Cle Elum, which the court awarded solely to Sammeth. The court granted the motion in July 2024 and ordered that he be taken off the mortgage within six months. Sammeth timely appeals.[1]

## II. ANALYSIS

A. Committed Intimate Relationship

---

[1] This court consolidated Sammeth's various appeals, namely, her appeal from the trial court's findings of fact and conclusions of law and dissolution order, from the trial court's contempt order, and from its order to enforce the divorce decree.

Sammeth asserts that the trial court erred in finding the parties were not in a CIR from 1991 to 1998, i.e., prior to their marriage.

A CIR is a stable, marital-like relationship where both parties cohabitate with knowledge that a lawful marriage between them does not exist. Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995). Five factors are considered when determining whether one exists: (1) continuous cohabitation, (2) the duration of the relationship, (3) the purpose of the relationship, (4) the pooling of resources and services for joint projects, and (5) the intent of the parties. In re Pennington, 142 Wn.2d 592, 601, 14 P.3d 752 (2000). This court has held that "the weight to be given to each factor has not been established, nor has how to balance one factor against any other factor or factors." In re Committed Intimate Relationship of Muridan & Redl, 3 Wn. App. 2d 44, 55, 413 P.3d 1072 (2018). Rather, as our Supreme Court has explained, "[t]hese characteristic factors are neither exclusive nor hypertechnical . . . [and] are meant to reach all relevant evidence helpful in establishing whether a [CIR] exists." Pennington, 142 Wn.2d at 602. Ultimately, whether relationships are properly characterized as CIRs "depends upon the facts of each case." Id.

Moreover, whether parties were in a CIR presents a mixed question of law and fact. Id. at 602-03. We review de novo whether the trial court's legal conclusions properly flow from its factual findings. Id. We treat unchallenged factual findings as verities on appeal. Morin v. Harrell, 161 Wn.2d 226, 230, 164 P.3d 495 (2007). And we review challenges to a trial court's factual findings for substantial evidence. In re Marriage of Fahey, 164 Wn. App. 42, 55, 262 P.3d 128,

3

134 (2011). Evidence is "substantial" if it would persuade a rational, fair-minded person of the finding's truth. Id. In our review of such evidence, we neither weigh the proof nor judge the credibility of the witnesses. In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

We hold that there is substantial evidence to support all but one of the Pennington factors weighed against finding the parties were in a CIR between 1991 and 1998, as the court concluded.

The first factor—continuous cohabitation—weighs in favor of a finding that a CIR existed if the cohabitation is "without any periods of separation" or is not merely "sporadic cohabitation." Muridan, 3 Wn. App. 2d at 58. The evidence shows the parties did not continuously cohabitate or even continuously date over the span of the seven years at issue, as Sammeth concedes. Sammeth acknowledges that she and Ervin dated "on again off again," and that there was a "break in the relationship" for a time in the middle of that period, in the mid-90's, where she and Ervin "went on break." Substantial evidence thus supports the court's factual findings that they were only romantically involved for some of those years, let alone cohabitating. Accordingly, the court did not err in concluding that a lack of continuous cohabitation weighed against the existence of a CIR.

As to the second factor—the duration of a relationship—our Supreme Court has held that, while a "long term" relationship is not a threshold requirement to find a CIR, "duration is a significant factor." Connell, 127 Wn.2d at 346. It further held that the shorter the term of a relationship, the more important other factors become. See id. (explaining that "[a] 'short term' relationship may be characterized

4

as [a CIR], but a number of significant and substantial factors must be present.") This court has held that a relationship of the same duration as the one in this case (seven years) was a CIR, but we did so after finding the couple had been in a dating relationship before living together continuously for a total of over six years. Muridan, 3 Wn. App. 2d at 59. There was no such continuity claimed here and, given the absence of "significant and substantial factors," the court did not err in concluding that this factor weighs against a finding of a CIR.

As to the third factor—the purpose of a relationship—parties convey a shared purpose where there is a record showing "permanency planning, shared love and intimacy, extended family relationships, caring for one another when sick, and holding themselves out as a couple[.]" In re Meretricious Relationship of Long & Fregeau, 158 Wn. App. 919, 927, 244 P.3d 26 (2010). Additional evidence of a shared purpose includes where parties "presented themselves to the world as a family by living together as a couple, attending events together, and asserting in writing that they were domestic partners[,]" or evidence the purpose of the parties' relationship was to provide "companionship, support, and to create a family." Muridan, 3 Wn. App. 2d at 59. Because the record is devoid of any of this kind of evidence demonstrating a shared purpose in the relationship, the court did not err in concluding this factor weighed against a CIR.

The fifth factor—the parties' intent—is a related, but distinct factor, as it requires us to assess whether the evidence shows they intended to be in a marriage-like relationship. See Long, 158 Wn. App. at 928. Evidence that weighs in favor of finding two people had a shared intent to form a CIR includes proof of a

5

decision to raise a child together, to seek out marriage counseling to maintain a relationship, and any attempts to continue to have children. Muridan, 3 Wn. App. 2d at 60. Additionally, we have specifically held that where two people were not continuously cohabitating for the entirety of the period in question, evidence that they "remained in contact and did not date other people" suggested they still intended to be in a romantic relationship. Morgan v. Briney, 200 Wn. App. 380, 388, 403 P.3d 86 (2017).

Here, in addition to the undisputed fact that Sammeth and Ervin did not cohabitate or date continuously from 1991 through 1998, Ervin testified that he dated other people during that time, and he did not know whether Sammeth had done so as well. And there was no evidence offered of a decision to have children or seek counseling. It was thus not an abuse of discretion to conclude the factor concerning the parties' intent disfavored finding a CIR.

Evidence of the fourth factor—that a couple pooled their resources or attempted to do so—weighs in favor of a couple being in a CIR; for example, by jointly managing or financing property, or jointly contributing to items such as a mortgage, utility, or other household expenses. Long, 158 Wn. App. at 927.

And it is true that Sammeth established that the parties purchased property together and brought a related lawsuit together,[2] and, thus, there is some evidence in the record of some pooling of resources, which might weigh in favor of a CIR. From this, Sammeth argues "[s]ubstantial evidence supports there being a CIR" and, as a result, the court's contrary legal conclusion does not "flow from the

---

[2] For his part, Ervin asserted he was barely involved in that litigation.

findings."

Sammeth misstates the fundamental question, which is whether there *is* substantial evidence for the court's factual findings in support of its conclusion the parties were not in a CIR, not whether any evidence could support the contrary determination. Pennington, 142 Wn.2d at 602-03; Fahey, 164 Wn. App. at 55. We hold that, considering the totality of the factors and even assuming the evidence of jointly purchased property satisfied *one* of the Pennington factors, there was additional substantial evidence in the record to suggest the other factors weighed against ruling the parties were in a CIR. Thus, we hold that the court's legal conclusion properly followed from its findings, and it did not err. Pennington, 142 Wn.2d at 602-03.

B.      Property Division

Sammeth next asserts that the court repeatedly erred in its distribution of assets by mischaracterizing numerous pieces of property, and she argues its division of property was inequitable.

In a dissolution proceeding, RCW 26.09.080 guides a trial court's distribution of assets and liabilities. The court will distribute property "either community or separate, as shall appear just and equitable." RCW 26.09.080. A just and equitable distribution contemplates four non-exclusive factors, including:

> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage of domestic partnership; and
> (4) The economic circumstances of each domestic partner at the time the division of the property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

7

Id.

The trial court's discretion to distribute property in a dissolution proceeding is "broad" because it is "in the best position to assess the assets and liabilities of the parties" to ascertain what is just and equitable. In re Marriage of Brewer, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). Thus, on appeal, we accord trial courts in dissolution proceedings "significant deference." In re Marriage of Farmer, 172 Wn.2d 616, 630, 259 P.3d 256 (2011). We will only reverse a trial court's distribution if there is a *manifest* abuse of discretion and the distribution is based on untenable grounds or untenable reasons. In re Marriage of Neumiller, 183 Wn. App. 914, 920, 335 P.3d 1019 (2014). We consider the trial court's characterization of property to be relevant as we determine whether it abused its discretion, but it is not controlling. Brewer, 137 Wn.2d at 766.[3] The ultimate question is whether the division is just and equitable. In re Marriage of Groves, 10 Wn. App. 2d 249, 254, 447 P.3d 643 (2019). We are "reluctan[t] to revisit a trial court's distribution of property when the court mischaracterizes assets as separate or community property but otherwise makes a just and equitable distribution." Farmer, 172 Wn.2d at 631.

We evaluate whether property division is fair and equitable based on all the

_____

[3] We review the legal characterization of property de novo and review the factual findings to support that characterization for substantial evidence. In re Marriage of Watanabe, 199 Wn.2d 342, 348-49, 506 P.3d 630 (2022). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted." In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014).

facts and circumstances. In re Marriage of Stachofsky, 90 Wn. App. 135, 147, 951 P.2d 346 (1998). Although this court has articulated a general objective to place parties to long-term marriages (25 years or more) in "roughly equal" financial positions, we have expressly disavowed that we impose any "mandate," even for such parties, "for trial courts to predict the future, divide assets with mathematical precision, or guarantee future equality." In re Marriage of Kaplan, 4 Wn. App. 2d 466, 475-76, 421 P.3d 1046 (2018). Rather, the purpose of our review is to ensure the trial court exercised its discretion to consider all of the statutory factors set out in RCW 26.09.080 and reached a just and equitable distribution, overall. See id. Again, the ultimate obligation of the trial court is to "arrive at a fair, just and equitable distribution of assets and liabilities *regardless* of their characterization as separate or community." In re Marriage of Brady, 50 Wn. App. 728, 731, 750 P.2d 654 (1988) (emphasis added).

Here, Sammeth avers that the court repeatedly erred in its division of property, which arguments may be grouped into three categories: (a) by mischaracterizing or misvaluing various pieces of property, (b) by excluding evidence she sought to introduce as hearsay, and (c) by failing to account for incentive compensation payments that Ervin received.

As to the first, Sammeth claims the court mischaracterized particular property in over half a dozen ways. Specifically, she asserts that the court:

1.  did not properly classify three retirement accounts which it awarded to her, and which had a value totaling about $313,000.[4]

---

[4] Specifically, she makes two claims about rollover IRA and traditional IRA accounts that she was awarded, which had a total value of about $306,000: (1) the rollover IRA was *properly* characterized as separate property in the court's findings

2.      valued a saddle and horse tack she was awarded at $5,000 without any substantial evidence to support that total, as it was simply based on Ervin's "wild guess."

3.      valued a piano purchased for $1,000 at $2,000, which was an abuse of discretion because, she claims, it did not appreciate in value and this total was based solely on Ervin's "unspecified search on craigslist."

4.      "double counted" $25,000 in proceeds from the sale of a home in Leavenworth with a Wells Fargo CD having the same value in her total community property allocation because Sammeth had testified the CD had been purchased *from* those proceeds.

5.      classified a vehicle with a value of $2,500 as community property when it should have been considered separate property because it was purchased before marriage.

6.      did not "make up for the loss" in her total sum, after it removed a checking account that did not have any money in it, which had originally been listed with a value of $30,000.

7.      classified an account as community property, which it divided *evenly* between the parties, giving each of them $38,000, when it should have determined that she and Ervin each received half of it as *separate* property after their son died intestate.

8.      mischaracterized her half of proceeds evenly split between she and Ervin from the sale of the Leavenworth properties ($660,000) as separate property, when this total should have been factored into the total community property she was awarded, because they derived solely from the sale of community assets in the divorce.

Sammeth concedes "many of these [asserted errors] individually may not warrant remand."  But she asserts these mischaracterizations lowered the overall

---

but incorrectly "placed in the community column" on the spreadsheet, and (2) the traditional IRA  (which the spreadsheet deemed community property) should have been considered *mixed* community/separate property.  And she claims a third account which was worth about $7,000 was "incorrect[ly characterized] in the [court's] findings," though she admits it *was* "correct on the spreadsheet."

10

percentage of community property she received, and avers that the court improperly justified its spousal maintenance award based on this incorrectly calculated "disproportionate share" of community property it purported to award her. She also summarily concludes the court's "refusal to divide separate property" caused a "patent disparity" in the parties' economic positions, which she states is an abuse of discretion and inequitable outcome.

We hold that Sammeth has not shown that her various claimed errors in the court's categorization affected the fairness of the overall property division, or that it split the assets inequitably in their multi-million-dollar marital estate. Sammeth nearly admits this point in her opening brief, when she notes, "To be sure, Traci receiving $3.6 million in assets *is not nothing*[. . .]: she received two homes (totaling almost $1.1 million), $28,321 in cash, $381,795 in securities/investment accounts, $1.4 million in retirement accounts, and about $66,000 in other personal property (like cars, a horse, a piano, etc.)." (Emphasis added.)

Her arguments are unavailing for several reasons. First, none of her briefing concretizes the degree to which she is claiming the court's alleged mischaracterizations actually decreased her total assets. In other words, she never identifies the correct percentage of the community property she *did* receive, let alone establishes why that amount was inequitable, as is her burden. She simply argues that the total community property she received was "lowered *by a notable*"—(*unspecified*)—"percentage." See Kauzlarich v. Yarbrough, 105 Wn. App. 632, 652-53 n.5, 20 P.3d 946 (2001) (holding that appellant did not make "a fully reasoned argument" and that "[p]assing treatment of an issue or lack of

reasoned argument is insufficient to merit judicial consideration.").[5]

Even if we accept her various errors for the sake of argument, and we ourselves attempt to estimate the resulting total of her community property, her claim is still unavailing. Adding up the assets which she asserts were wrongly attributed to her "community" column, the monetary value of her community property would be lowered by about $365,000.[6] This means that—even granting every error she asserts occurred—she still received $2,644,283, which is 47% of the marital community property, rather than what the court tabulated as $3,009,283, which is 54% of the $5,563,182 total. But this percentage remains a roughly even split of the multi-million-dollar marital estate.

And again, and most fundamentally, Sammeth nowhere explains why the amount of assets she received is unjust and inequitable, even assuming some property was mischaracterized and her percentage of the marital estate was somewhat lower than awarded. Cf. Groves, 10 Wn. App. 2d at 254. She cites no

[5] The only number Sammeth ever provides with reference to her total assets is her contention she received closer to 53%, rather than 57% of the community assets. However, it is not clear where she finds support for the repeated assertion the court purported to give her 57% of the community property, as the evidence in the record indicates the court meant to set her portion of the community assets at approximately 54%.

[6] This estimate is based on subtracting the following amounts from her total based on her various claimed errors: about $300,000 for the mischaracterized retirement accounts; $1,000 for the improper valuation of the piano; a hypothetical, several thousand dollars for the inaccurately valued horse tack; $25,000 for the "double counted" Wells Fargo CD; and $38,000 for the money from their son's account. In reaching this number, we do *not* include: (1) her claim regarding $30,000 that was missing from a checking account because she argues she was *not* awarded that amount, and (2) her claim regarding the sale of Leavenworth property because she argues she and Ervin *both* received $660,000 from the proceeds, so this would not change her relative percentage of the community assets.

12

authority for the proposition it was an abuse of discretion for the court to divide a multi-million-dollar estate in this medium to "long-term marriage" in a "roughly equal" rather than *perfectly* equal manner. Cf. Kaplan, 4 Wn. App. 2d at 475-76.

Relatedly, during oral argument, Sammeth's counsel asserted he did not know of any case where the spouse who received more of the community assets was the "financially advantaged" spouse, appearing to reference the fact that Ervin had worked outside the home during the marriage and had a larger amount of separate property. See, e.g., Wash. Ct. of Appeals oral argument, In re Marriage of Sammeth & Ervin, No. 86265-1-I (July 11, 2025), at 5 min. 46 sec. through 6 min., 8 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025071100/?eventID=2025071100. This argument does not accurately address or meet Sammeth's burden to prove the court manifestly abused its discretion by distributing the property as it did here. Sammeth has provided no authority. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

This court will only modify or reverse a distribution that is unfair, unjust, or inequitable, and here, "[t]aking into account the economic circumstances of the parties in the instant case," we cannot say that it was. Brady, 50 Wn. App. at 732.

Having carefully reviewed the record, Sammeth's arguments, and Ervin's responses, we conclude Sammeth did not show that the court's distribution of

assets was unjust and inequitable, in light of all the facts and circumstances. Stachofsky, 90 Wn. App. at 147. It did not abuse its "broad" discretion in its division of assets which awarded Sammeth over 3 million dollars—a large portion of which was liquid, in the form of cash from house sale proceeds and funds in bank accounts. Brewer, 137 Wn.2d at 769. Considering the circumstances of the parties and where the "aggregate value of the property before the court was high," its division was not unfair merely because it may have mischaracterized some of the property. See In re Marriage of Pilant, 42 Wn. App. 173, 178, 709 P.2d 1241 (1985). Any mischaracterization is not reversible error, as Sammeth has not disproven that "the distribution is, on the whole, fair and equitable." Id. at 181.[7]

C.    Maintenance

Sammeth next claims the court erred in ordering that she receive only 36 months of spousal maintenance, at $5,000 a month, retroactive to the date Ervin began making temporary maintenance payments.

RCW 26.09.090 guides a trial court in its decision of whether to award spousal maintenance. Courts are authorized to award maintenance "in such amounts and for such periods of time as the court deems just." RCW 26.09.090(1). Spousal maintenance is "a flexible tool by which the parties' standard of living may

---

[7] For the same reasons, we decline to fulsomely address her additional arguments about the division of property concerning exclusion of evidence or the incentive compensation payments. See Wash. Farm Bureau Fed'n v. Gregoire, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007) ("Principles of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.") (quoting Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 68, 1 P.3d 1167 (2000)). Those arguments fail for the same reason.

be equalized for an appropriate period of time." In re Marriage of Washburn, 101 Wn.2d 168, 179, 677 P.2d 152 (1984). However, spousal maintenance is not awarded as a matter of right; rather, it is discretionary. In re Marriage of Mueller, 140 Wn. App. 498, 510, 167 P.3d 568 (2007).

A trial court may order maintenance "in such amounts and for such periods of time as the court deems just," after considering six non-exclusive factors:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;
> (c) The standard of living established during the marriage or domestic partnership;
> (d) The duration of the marriage or domestic partnership;
> (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090(1). Trial courts have broad discretion to award maintenance and an award will not be overturned on appeal absent a showing of a manifest abuse of discretion, such as when a decision is manifestly unreasonable or based on untenable grounds or reasons. In re Marriage of Wilcox, 3 Wn.3d 507, 517, 553 P.3d 614 (2024). In addition, "'[m]aintenance not based on fair consideration of the statutory factors constitutes an abuse of discretion.'" Id. at 521 (quoting In re Marriage of Anthony, 9 Wn. App. 2d 555, 564, 446 P.3d 635 (2019)).

15

We review a trial court's findings of fact supporting a maintenance award for substantial evidence. In re Marriage of Leaver, 20 Wn. App. 2d 228, 238, 499 P.3d 222 (2021). But, again, we review the ultimate issue, as to how the court applied RCW 26.09.090, for a manifest abuse of discretion, which is a "very deferential" standard, and we do not substitute our judgment for that of the trial court. Id.

Here, Sammeth has not shown that the court's spousal maintenance award was based on untenable grounds or reasons or that it was manifestly unreasonable. Cf. Wilcox, 3 Wn.3d at 517. Her arguments are unsupported in four respects.

First, Sammeth flatly asserts the award is "so inequitable" because the court's "findings suggest that a much larger maintenance award was warranted." As with her claim about its CIR ruling, this argument misunderstands the operative standard of review, which is whether there is substantial evidence for the factual findings underlying the maintenance award that the court *did* order. Leaver, 20 Wn. App. 2d at 238. There is indeed substantial evidence to support the court's general conclusion, as to factor (a) for example, that both parties "will have a considerable amount of assets" as a result of the overall asset division and maintenance award.

Second, while Sammeth's briefing does not expressly address the second guiding statutory factor—the time necessary to acquire sufficient education or training—her claim ignores the court's finding it was "not convinced [she] made a good faith effort to find a legal position that would afford her a higher salary than

16

what she currently makes as a waitress." We will not disturb this credibility determination which informed its award. Leaver, 20 Wn. App. 2d at 238. Thus, to the extent her brief implicitly challenges this finding, it fails.

Third, Sammeth offers no case law to support her propositions the court was required to order a higher maintenance award because it did not divide the *entire* marital estate precisely in half, or that in reviewing the amount of maintenance, we must count only the sum she will receive after the date of the divorce. DeHeer, 60 Wn.2d at 126.

Finally, Sammeth does not identify where in RCW 26.09.090 the legislature states that an award should be deemed inequitable because, absent a higher total, she will not "come close to recreating even a semblance of" a standard of living during her marriage which included taking "trips to numerous other states and countries," "regularly purchas[ing] properties," and owning "numerous vehicles." Indeed, counsel acknowledged at oral argument, there is no case which holds a party is "entitled to the exact same standard of living that they had pre-divorce." Wash. Ct. of Appeals oral argument, supra at 3 min., 29 sec. through 3 min., 43 sec. We decline to create such a standard.

For these reasons, we conclude that Sammeth has not shown the court abused its discretion in its spousal maintenance award. Wilcox, 3 Wn.3d at 517.

D.    Other Claims

1. Intransigence

Sammeth next claims the court erred in ordering her to pay a total of $30,007 in attorney fees, after it found her to be intransigent.

17

"Awards of attorney fees based upon the intransigence of one party have been granted when the party engaged in 'foot-dragging' and 'obstruction' . . . or simply when one party made the trial unduly difficult and increased legal costs by his or her actions." In re Marriage of Katare, 175 Wn.2d 23, 42, 283 P.3d 546 (2012) (alteration in original) (quoting In re Marriage of Greenlee, 65 Wn. App. 703 708, 829 P.2d 1120 (1992)). Fee awards based on intransigence are reviewed for an abuse of discretion. In re Marriage of Wixom, 190 Wn. App. 719, 725, 360 P.3d 960 (2015). As before, a trial court abuses its discretion when its "decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

We reject Sammeth's arguments in support of this claim for three reasons. First, Sammeth argues the court abused its discretion because it did not "set out how it determined intransigence." Its nearly 12 enumerated findings indicate otherwise.

Second, Sammeth simply asserts the court's findings are "problematic" before making several propositions as to the proper time period for any intransigence findings, the extent of her duty to cooperate, and the level of specificity required for the court's findings. However, she does not provide legal authority to support the contentions she makes, so we decline to consider them further. DeHeer, 60 Wn.2d at 126.

Finally, Sammeth claims the court did not properly segregate the fees it awarded for intransigence and it is "hard to say" what part of the total was for intransigence and what fees were incurred for other reasons. But the court was

not required to segregate fees based on intransigence from fees based on other grounds when it also found her intransigence permeated much of the proceedings. In re Marriage of Bresnahan, 21 Wn. App. 2d 385, 411, 505 P.3d 1218 (2022).[8] Ultimately, we conclude the trial court reasonably relied on Sammeth's intransigence in calculating the fee award and it did not abuse its discretion.[9]

2. Burnet Analysis

Sammeth also argues she was "prejudiced" by the court's "failure to perform a Burnet analysis" when it did not admit a portfolio Sammeth sought to enter during the trial. Br. of Appellant at 58 (citing Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997)). However, no Burnet analysis was required because the court's ruling did not concern a discovery violation. Rather, what the court found was that a portfolio Sammeth sought to enter was not appropriate rebuttal evidence.

Sammeth newly contends in reply that the court erred—either by failing to perform a Burnet analysis—or by refusing to allow the evidence as rebuttal evidence. This claim fails procedurally and substantively. As to the former, "[a]n

---

[8] Sammeth offers no substantive explanation or authority to support her contention, in reply, that the court's finding she displayed "intransigence throughout the pendency of these proceedings" is not the same as the standard in the pertinent case law, regarding "acts that permeate the entire proceedings." This appears to be a distinction without a difference.

[9] We do not reach Sammeth's additional claim of evidentiary error she did not raise below and makes in one conclusory sentence. Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (holding "[w]e will not consider an inadequately briefed argument."). And we reject Sammeth's claim that we must reverse the order on fees because it includes a miscalculation. Despite a typo in the judgment summary of the decree, the order itself includes the proper sums and yields the correct total.

issue raised and argued for the first time in a reply brief is too late to warrant consideration." Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). As to the latter, we review decisions whether to admit evidence on rebuttal for an abuse of discretion. Kremer v. Audette, 35 Wn. App. 643, 648, 668 P.2d 1315 (1983). And Sammeth has not shown the court abused its discretion in rejecting her evidence on rebuttal. To the contrary, we have held it is not an abuse of discretion to reject evidence which a party chose not to offer but which was available to it during their case in chief, as occurred here. Id.

    3. Contempt

Sammeth also claims the court applied the incorrect legal standard in refusing to hold Ervin in contempt for violating a prior temporary order by selling stock during the dissolution proceedings. We review contempt decisions for abuse of discretion. In re Marriage of Williams, 156 Wn. App. 22, 27, 232 P.3d 573 (2010).

We disagree with Sammeth that its contempt decision was based on untenable, impermissible grounds. Specifically, she argues the court applied an incorrect standard in its contempt ruling and required proof of bad faith because the contempt statute that is applicable to temporary family law orders does not require that showing. Instead, she notes RCW 7.21.010(1)(b) simply requires proof Ervin intentionally violated the court's order. Thus, she asserts the trial court erred by not finding Ervin in contempt because she claims it found he intentionally violated the court's order simply by concluding he "knew about the orders."

Examining the language of the order and the court's entire finding, we

conclude that Sammeth's argument fails because it depends on a selective reading of the record. The order which Sammeth claimed Ervin violated forbid both parties from selling any community property "unless it is a usual business practice." The court concluded Ervin had not intentionally violated or disobeyed the terms of the order, given the "usual business practice" exception, after it found he had always been the spouse who bought and sold stock during the marriage and he had not sold the stock at issue to benefit himself individually.

Therefore, based upon looking beyond the phrase "bad faith" to the full context of the court's findings, we conclude the court did not abuse its discretion in its contempt decision.[10]

4. Final Order

Finally, Sammeth claims the court erred in requiring her to remove Ervin's name from the mortgage of the home in Cle Elum which she was awarded in the final divorce order. On this point, we agree.

A trial court may later clarify its ambiguous dissolution decree. In re Marriage of Thompson, 97 Wn. App. 873, 878, 988 P.2d 499 (1999). Put differently, a definition of rights or obligations that were already given in a decree may be spelled out more completely, if necessary. In re Marriage of Michael, 145 Wn. App. 854, 859, 188 P.3d 529 (2008). But a trial court may not *modify* a dissolution decree, including revoking or modifying any property disposition

---

[10] Sammeth's reply brief also appears to suggest his sale of the stocks caused losses because they left her "aggrieved," but provides no specification or explanation as to *how*. In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998) (courts are not obligated "to comb the record" where counsel has failed to challenge specific findings and support arguments with citations to the record).

therein, "unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this state." RCW 26.09.170(1).

Further, this court has noted that, in proceedings to modify a dissolution decree under chapter 26.09 RCW, due process requires an opportunity to be heard. See In re Marriage of Sagner, 159 Wn. App. 741, 752, 247 P.3d 444 (2011); see also Kauzlarich v. Dep't of Soc. & Health Servs., 132 Wn. App. 868, 876 n.8, 134 P.3d 1183 (2006) ("At a minimum, procedural due process requires notice and an opportunity to be heard."). We have explained, "[n]otice and the opportunity to be heard on matters which materially affect a litigant's rights are essential elements of due process that may not be disregarded." In re Marriage of Mahalingam, 21 Wn. App. 228, 230, 584 P.2d 971, 974 (1978). And, we noted, according to the Rules of Civil Procedure which govern proceedings under chapter 26.09 RCW, a moving party must give at least five days' notice of a hearing on that motion. Id.

Here, the trial court's dissolution order awarded Sammeth the Cle Elum property in its entirety; both its value, and "debt." And Ervin was the only person named on the home's mortgage because, as Ervin notes, "Sammeth's financial situation would have impeded the loan." However, the question of which party's name would remain on the mortgage was not mentioned in the court's findings or addressed by the dissolution decree.

Although Ervin titled his motion a "motion to 'enforce'", he inter alia sought that Sammeth remove his name and he appeared to concede in the motion itself that this request was a new one. Clerk's Papers (CP) at 1216 ("*While not a per se enforcement issue, I am asking* that Traci *be required* to remove my name from

the mortgage on the Cle Elum home—the home that was awarded to her in our divorce.") (emphasis added).

The court granted his request and ordered Sammeth to remove Ervin's name from the mortgage within six months, after noting it had "considered the parties' briefing on this matter and is familiar with the records and files in this case." In other words, his motion was decided without argument.

We conclude Ervin's request to remove his name was essentially a motion to *modify* the dissolution decree, since it had not reached the issue of whose name could permissibly remain on the Cle Elum mortgage. He sought to "enforce" a provision that was not actually in the decree. As Ervin himself acknowledges, "[n]owhere in the decree does the trial court mention Ervin being obligated to remain on the Cle Elum property's mortgage." Nor did the court simply clarify the dissolution decree, in granting his request. In so contending, Ervin identifies no ambiguous language in the decree. It is also not clear how ordering Sammeth to remove his name simply spelled out some right or obligation that had already been given in the decree, since it never mentioned the loan document. Cf. Michael, 145 Wn. App. at 859.[11]

That said, with respect to Ervin's request to remove his name from the mortgage, we conclude that in effect, the trial court granted a motion to modify the

---

[11] Ervin appears to unintentionally concede that the court's decision over whether the parties were required to change the names on the mortgage document could have consequences with the potential to *extend* their obligations and *reduce* their rights—"constituting modification." Indeed, Sammeth asserts that requiring her to remove Ervin's name from the loan documents would force her to refinance and take on a significantly higher interest rate.

decree without affording Sammeth an opportunity to argue the matter. Cf. Kauzlarich, 132 Wn. App. at 876 n.8. Therefore, we vacate that portion of the order requiring her to remove Ervin's name and remand this matter to the court to afford Sammeth sufficient procedural due process in a hearing on Ervin's motion. Mahalingam, 21 Wn. App. at 230. In so holding, we do not reach whether or not the court must grant his request on the merits or the manner in which the court must proceed, whether with or without oral argument or the taking of testimony.

H.      Fees

In her briefing, Sammeth asked this court to order Ervin pay her reasonable attorney fees under RCW 26.09.140 and her costs under RAP 14.2 and 14.3. During oral argument, her counsel expressly waived her request for attorney fees, leaving only a request for costs. Wash. Ct. of Appeals oral argument, supra at 8 min., 48 sec. through 9 min., 1 sec.

Ervin too requests attorney fees. He argues he is entitled to fees because Sammeth's "filing of this appeal is every bit as intransigent as the proceeding below." See In re Marriage of Mattson, 95 Wn. App. 592, 605, 976 P.2d 157 (1999) (explaining that intransigence is a basis for awarding fees on appeal that is separate from RCW 26.09.140, which considers financial need.).

We decline to award either party fees or costs on appeal. As to Sammeth, she does not "substantially prevai[l]" so as to merit costs. RAP 14.2. As to Ervin, we disagree that Sammeth's appeal is intransigent. We do not conclude that it is so meritless that it "amounts to little more than an effort to carry on with the same efforts which caused [the appellant] to lose credibility with the trial court." In re

Marriage of Sievers, 78 Wn. App. 287, 312, 897 P.2d 388 (1995). We need not, and do not, impose additional fees simply for asserting unavailing appellate arguments. Moreover, we deny both parties fees because each party is financially able to pay their own fees without "critical hardship." Kaplan, 4 Wn. App. 2d at 488; see also In re Marriage of Vander Veen, 62 Wn. App. 861, 869, 815 P.2d 843 (1991) (awarding to neither party in an appeal from a dissolution decree, where the issues were not frivolous and both had sufficient financial resources to pay their respective fees.).

### III.    CONCLUSION

We remand this matter to the trial court solely for Sammeth to be heard as to whether she must remove Ervin's name from the mortgage on the Cle Elum property, but otherwise we affirm. We do not award Sammeth costs nor do we award Ervin fees or costs on appeal.

Díaz, J.
_____

WE CONCUR:

Feldman, J.
_____

Smith, J.
_____